Opinion issued June 12, 2003














 


In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-02-00498-CR
____________
 
PATRICK ALLEN PALACIOS, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 177th District Court
Harris County, Texas
Trial Court Cause No. 869064
 

 
 
MEMORANDUM OPINION
          Following a bench trial, the trial court found appellant, Patrick Allen Palacios,
guilty of capital murder and sentenced him to confinement for life.


 In three points
of error, appellant contends that the evidence was legally and factually insufficient
to support his conviction and that the trial court erred in not inquiring into an alleged
conflict between appellant and his trial counsel.
          We affirm.
Facts and Procedural Background
          On the night of February 14, 2001, the complainant, Bertha Molano, was killed
in her house at 1434 Reid Street in Houston, Texas. Molano’s daughter, Josephine
Cantu, lived next door, and Molano’s sister, Delores Pavlicek, lived two houses away. 
Cantu and Pavlicek testified that, beginning at about 3:00 or 3:30 p.m. that day, they
saw Molano drinking beer on her front porch with two friends from the
neighborhood, Filomeno Solis and Carlos Rebollar. Sometime after 3:00 p.m., Cantu
and her children took some Valentine’s gifts to Molano’s house and gave them to
Molano.
          At about 4:00 p.m., appellant, who also lived in the neighborhood, walked up
to Molano’s porch and began drinking also. Solis testified that appellant was “hitting
on” Molano and was trying to get her to tell Solis and Rebollar to leave so that
appellant and Molano could be alone. Molano rejected appellant’s advances and told
him that she already had a boyfriend and “didn’t want nothing to do with another
man.”


 Solis and Rebollar subsequently left Molano’s house at about 6:30 p.m.,
leaving Molano alone with appellant.
          Cantu testified that, at about 6:45 p.m., as Cantu and her family were leaving
their house to eat dinner at a restaurant, Cantu knocked on the front door of Molano’s
house to see if Molano wanted them to bring her something to eat. Cantu noticed that
the lights in the house were turned off and that the curtains were drawn. Molano
answered Cantu’s knock and came to the front door, and Cantu noticed that her
mother, who was wearing an orange shirt, seemed “quiet” and “nervous.” Molano
told Cantu that nothing was wrong and that she did not want anything to eat.
          When Cantu and her family returned from the restaurant at about 8:15 p.m.,
Cantu took three of her children to Molano’s house to take a bath. The lights in the
house were still off, and when Cantu knocked on the front door, she received no
answer. Cantu subsequently tried to telephone Molano, but Molano did not answer
the phone.
          Pavlicek testified that, when she locked the gate on her fence at about 9:30
p.m., she noticed that the lights in Molano’s house were off. When Pavlicek
unlocked her gate at about 4:45 a.m. the next morning, she saw appellant pushing a
baby stroller in Molano’s driveway. Pavlicek saw that appellant had some things in
the stroller, including a VCR, an iron, and Valentine’s gifts. Pavlicek recognized the
items as belonging to Molano. She also noted that appellant was wearing the same
orange shirt that she had seen Molano wearing the day before, and appellant was
attempting to cover the items in the stroller with a white t-shirt similar to the one that
she had seen appellant wearing the day before. When Pavlicek rattled the chain on
her gate, appellant turned, saw her, and then walked down the driveway and down the
street, pushing the stroller.
          David Sanchez testified that, at about 5:30 a.m. on February 15, 2001, while
he was working as a Houston Police Officer, he received a dispatch to the location of
a pay telephone and found appellant calling 9-1-1. Appellant, who still had the baby
stroller and its contents with him, told Sanchez that he had seen “a dead woman”
down the street and offered to show Sanchez where she was. Sanchez placed the
stroller and its contents in the trunk of his patrol car and drove appellant the short
distance to Molano’s house. When they arrived, Sanchez found the front door of
Molano’s house locked, and he called for backup.
          Josie Cantu testified that, when she saw Officer Sanchez’s patrol car parked in
front of her house, with appellant inside, she was concerned that something had
happened to Molano because she saw that appellant was wearing Molano’s shirt. 
Cantu later identified the stroller and the other items in the trunk of Officer Sanchez’s
car as belonging to Molano.
          Houston Police Officer D. C. Richardson testified that he received a dispatch
to 1434 Reid to assist Officer Sanchez. When he arrived, Richardson found that the
front and back doors of Molano’s house were locked. Richardson found an open
window with a torn screen and a chair positioned under the window, and he climbed
through the window and searched the house. In a bedroom, Richardson found
Molano deceased. Richardson then left the house, and Officer Sanchez notified the
Houston Police Department Homicide Division.
          Houston Police Sergeant R. G. Parish of the Homicide Division testified that
he was assigned to investigate Molano’s murder. Parish arrived at Molano’s house
at about 6:40 a.m. and spoke with appellant and the officers at the scene. Appellant
told Parish that, as he was walking on Reid Street to go to work that morning, a man
appellant knew as “Joe Vela” told appellant that he had killed a lady “down the
street,” and appellant had gone into Molano’s house to verify that she was dead. 
Appellant also told Parish that he had slept at his sister’s house the night before. 
Upon Parish’s request, appellant agreed to give a written statement and was
transported to the police department.
          Sergeant Parish testified that he noticed the torn window screen and chair. No
fingerprints matching appellant’s were obtained from the area around the window. 
Inside the house, Parish found Molano’s body on a bed in a front bedroom of the
house, lying nude, on her back, with a pillow covering her face. A mop handle had
been inserted into Molano’s vagina and had pierced through her body.
          Houston Police Sergeant C. E. Elliot of the Homicide Division testified that he
took a written statement from appellant at the police station that morning. In his
written statement, appellant stated that he had not been to Molano’s house for “three
or four months” and that, on the evening of February 14, 2001, he ate dinner with his
mother and then went to his nephew’s house, where he spent the night. In his written
statement, appellant claimed that, the next morning, as he was pushing his nephew’s
stroller to a friend’s house, a friend of appellant’s named “Joe Villa [sic]” came up
to him on the street and told appellant that he had killed his girlfriend, Molano. 
Appellant stated that, as he continued pushing the stroller, he went to Molano’s house
and found the front door open. Appellant stated that he went inside, found Molano’s
body, and then left and called 9-1-1.
          Sergeant Elliot testified that, because appellant had been in Molano’s house
and had possibly contaminated the crime scene, Elliot asked appellant to provide
some “elimination” evidence, including fingerprints and hair samples. Appellant
consented and provided the evidence requested. While this evidence was being
collected, Elliot was informed by another police officer that appellant was wearing
Molano’s shirt. Elliot then requested, and appellant provided, the clothes that
appellant was wearing as potential evidence.
          Houston Police Officer T. Miller of the Homicide Division testified that he was
assigned to assist in the investigation of Molano’s murder. Miller interviewed
appellant’s mother, brother-in-law, and nephew and obtained information which was
“not consistent” with appellant’s oral statements and his written statement concerning
his whereabouts on the previous evening and how he had obtained the baby stroller.
          Officer Miller and another homicide investigator, Houston Police Sergeant
J. R. Swain, then interviewed appellant at the police station. Appellant informed
Miller that “Joe Vela” had a prior criminal conviction, but Miller was unable to locate
any criminal records concerning a person matching the name and description of “Joe
Vela” given by appellant. Swain testified that, while Miller was out of the room,
appellant admitted to Swain that he had been drinking at Molano’s house the previous
evening but had left at about 8:00 p.m. with Solis and Rebollar. Appellant told Swain
that he then met “Joe Vela” at a convenience store at about 9:00 p.m., and “Vela”
gave the baby stroller and its contents to appellant to keep for him until “Vela”
returned. When “Vela” did not return to the store, appellant pushed the stroller to his
nephew’s house, but his nephew was not home. Appellant told Swain that he then
returned to the convenience store, hid the stroller and its contents behind a dumpster,
and went to sleep under a bridge. Appellant returned to the store in the morning,
retrieved the stroller, and met “Joe Vela” as he was walking along Reid Street. 
Appellant told Swain that “Vela” then told appellant he had killed Molano.
          When Officer Miller returned to the interview room, he noticed what appeared
to be blood on appellant’s fingernails. When questioned about the blood, appellant
explained that the blood could have come from places where he had scratched
himself, and appellant showed Miller scratches on his left forearm, left thigh, and left
cheek. Upon Miller’s request, appellant consented to give swab samples of the blood
to the police.
          Officer Miller and Sergeant Swain then drove appellant to a house where
appellant told them “Joe Vela” lived with his mother. When they arrived, the officers
found an abandoned house, and, after talking with some neighbors, the officers
determined that no one had lived in the house for about six months. Appellant then
told the officers that “Joe Vela” would sometimes “hang out” at another location, near
some railroad tracks. When the officers took appellant to that location, no one was
there, and the officers then took appellant back to the police station.
          Officer Miller testified that he subsequently confronted appellant with some
of the “inconsistencies” in appellant’s various oral statements and his written
statement. Initially, appellant insisted that “Joe Vela” had murdered Molano. 
However, when Officer Miller told appellant that he wanted “the truth,” appellant
responded, “All right, I did it.” The officers then obtained two recorded statements
from appellant. In his recorded statements, appellant confessed to killing Molano
after he became angry with her when she belittled him during consensual sexual
intercourse. Appellant stated that he killed Molano by strangling her and then tried
to make it appear as though Molano’s house had been burglarized.


 The investigating
police officers subsequently obtained an arrest warrant and arrested appellant.
          Harris County Assistant Medical Examiner Dr. Patricia Moore testified that she
investigated the murder scene and performed the autopsy on Molano’s body. Moore
saw medical evidence indicating that Molano’s death was caused by asphyxiation. 
Moore noted abrasions on Molano’s neck, head, and chest consistent with Molano
having been strangled or suffocated. From the fractured vertebrae she observed in
Molano’s neck, Moore concluded that a significant amount of force was applied to
Molano’s neck when she was strangled. In Moore’s opinion, Molano’s death was
caused by asphyxiation secondary to manual strangulation or suffocation. Moore did
not observe any indications that Molano was raped. Due to a lack of hemorrhaging
in Molano’s vaginal area, Moore concluded that Molano was impaled with the mop
handle postmortem. Moore also observed photographs of marks on appellant’s left
arm, right hand, neck, and left leg and identified the marks as consistent with
fingernail marks.
          Houston Police Department Crime Laboratory Specialist Joseph Chu, called
as a witness by appellant, testified that DNA samples taken from the wound on
appellant’s left arm were consistent with scrapings taken from underneath Molano’s
fingernails. Chu also identified semen samples obtained from blankets found in
Molano’s bedroom as having originated from two different contributors other than
appellant.
Sufficiency of the Evidence
          In his first and second points of error, appellant argues that the evidence was
legally and factually insufficient to support his conviction for capital murder because
“the murder was the product of sudden rage, and did not happen during the course of
burglary or aggravated sexual assault” as charged by the State.
          In evaluating the legal sufficiency of the evidence, we view the evidence in the
light most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt. 
King v. State, 29 S.W.3d 556 (Tex. Crim. App. 2000). Although our analysis
considers all evidence presented at trial, we may not re-weigh the evidence and
substitute our judgment for that of the jury. Id.
          Under the factual sufficiency standard, we ask whether a neutral review of all
the evidence, both for and against the finding, demonstrates that the proof of guilt is
so obviously weak as to undermine confidence in the fact finder’s determination, or
the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary
proof. Id. Accordingly, we will reverse the fact finder’s determination only if a
manifest injustice has occurred. Id. In conducting this analysis, we may disagree
with the fact finder’s determination, even if probative evidence supports the verdict,
but we must avoid substituting our judgment for that of the fact finder. Id.
          A person commits the offense of capital murder if he intentionally causes the
death of an individual “in the course of committing or attempting to commit” a
burglary or aggravated sexual assault. See Tex. Pen. Code Ann. §§ 19.02(b)(1),
19.03(a)(2) (Vernon 2003). A person commits the offense of aggravated sexual
assault if he intentionally or knowingly causes the penetration of the anus or female
sexual organ of another person by any means, without that person’s consent and
causes serious bodily injury or attempts to cause the death of the victim or another 
person during the same criminal episode. See Tex. Pen. Code Ann. §§
22.021(a)(1)(A)(i), (a)(2)(A)(i) (Vernon 2003). A person commits the offense of
burglary if, without the effective consent of the owner, he enters a habitation not then
open to the public with the intent to commit a felony, theft, or an assault. See Tex.
Pen. Code Ann. § 30.02(a)(1) (Vernon 2003).
          Viewed in the light most favorable to the trial court’s verdict, the evidence
showed that, during the afternoon and evening of February 14, 2001, Molano
rebuffed appellant’s sexual advances toward her. Sometime later that night or early
the following morning, appellant had sexual intercourse with Molano and killed her. 
The medical evidence presented was sufficient for a fact finder to conclude that
appellant’s conduct was not consensual, given the scratch wounds to appellant and
the brutal nature of the wounds to Molano. From this evidence, the fact finder could
have reasonably concluded that appellant killed Molano while attempting to have
sexual intercourse with her against her will.
          On the morning after Molano’s murder, appellant was seen wearing Molano’s
shirt and attempting to leave her residence with a baby stroller and other items taken
from inside Molano’s house. At Molano’s house, investigating officers found an
open window with a torn screen and a chair positioned below the window. In his
recorded statements, appellant admitted that he had taken the items from Molano’s
house, albeit in an attempt to “fake” a burglary. From this evidence, the fact finder
could have reasonably concluded that appellant entered Molano’s house without her
consent and killed Molano to facilitate his theft of her belongings.
          We hold that the evidence was legally sufficient to support the trial court’s
finding that appellant committed the offense of capital murder.
          Here, a neutral review of all the evidence, both for and against the finding, does
not demonstrate that the proof of guilt is so obviously weak as to undermine
confidence in the fact finder’s determination, or that the proof of guilt, although
adequate if taken alone, is greatly outweighed by contrary proof. King, 29 S.W.3d
at 556.
          Appellant concedes that he committed “a brutal murder.” However, he
contends that, rather than supporting his conviction for capital murder, as charged,
the evidence proved that he had consensual sexual intercourse with Molano before
strangling her and that, instead of committing an actual burglary, he attempted to
“badly fake” a burglary. We disagree.
          As set forth above, the evidence presented at trial established, through direct
and circumstantial evidence, all of the elements necessary to support appellant’s
conviction for capital murder under either theory charged by the State. The
credibility of appellant’s recorded oral statement to the investigating officers was
impeached by his numerous, and admittedly false, oral statements and written
statement. The trial court, as fact finder, was free to believe or disbelieve all or any
parts of the statements that appellant made to the officers. Ly v. State, 908 S.W.2d
598, 602 (Tex. App.—Houston [1st Dist.] 1995, no pet.).
          Moreover, the State was not required to exclude all other reasonable
hypotheses except appellant’s guilt. See Geesa v. State, 820 S.W.2d 154, 165 (Tex.
Crim. App. 1991), overruled in part on other grounds, Paulson v. State, 28 S.W.3d
570, 571 (Tex. Crim. App. 2000).
          We hold that the evidence was factually sufficient to support the trial court’s
finding that appellant committed the offense of capital murder.
          We overrule appellant’s first and second points of error.
Conflict with Trial Counsel
          In his third point of error, appellant argues that the trial court erred in “failing 
to inquire into an obvious conflict” between appellant and his trial counsel.
          We note that a defendant does not have the right to his own choice of appointed
counsel, and unless he waives his right to counsel and chooses to represent himself
or shows adequate reason for the appointment of new counsel, he must accept the
counsel appointed by the court. Garner v. State, 864 S.W.2d 92, 98 (Tex.
App.—Houston [1st Dist.] 1999, pet. ref’d). A trial court is under no duty to search
until it finds an attorney agreeable to the defendant. Id. However, there are certain
circumstances in which a defendant may, upon a proper showing, be entitled to a
change of counsel. Id. A defendant must bring such a matter to the trial court’s
attention and must carry the burden of proving he is entitled to new counsel. 
Malcolm v. State, 628 S.W.2d 790, 791 (Tex. Crim App. [Panel Op.] 1982).
          An actual conflict of interest exists if counsel is required to make a choice
between advancing his client’s interest in a fair trial or advancing other interests to
the detriment of his client’s interest. Ex parte Morrow, 952 S.W.2d 530, 538 (Tex.
Crim. App. 1997). In order for an appellant to demonstrate a violation of his right to
reasonably effective assistance of counsel, based on a conflict of interest, he must
show (1) that counsel was actively representing conflicting interests, and (2) that the
conflict had an adverse effect on specific instances of counsel’s performance. Id. 
When a trial court knows, or reasonably should know, that a particular conflict of
interest exists, the court should initiate an inquiry. Cuyler v. Sullivan, 446 U.S. 335,
346-47, 100 S. Ct. 1708, 1717 (1980); Garner, 864 S.W.2d at 99.
          Here, appellant filed two virtually identical pro se motions regarding his
dissatisfaction with his appointed trial counsel, alleging that, among other things, trial
counsel had not met with him “in the past months” and had “taken no affirmative
action to preserve and to protect” appellant’s rights while appellant was incarcerated
awaiting trial.
          Contrary to appellant’s contention and, at the instigation of appellant’s trial
counsel, the trial court did address appellant’s complaints about his trial counsel at 
a pre-trial hearing held on April 8, 2002. When questioned by the trial court,
appellant explained that, prior to the hearing, he did not understand that the delays in
his trial setting were partly a result of his trial counsel’s requests for additional time
to gather potentially exculpatory expert medical and DNA evidence and testimony. 
Upon questioning by the trial court, appellant stated that he understood that his trial
counsel had been working on his behalf.
          The record thus indicates that appellant waived his complaints regarding any
alleged conflict between appellant and his trial counsel by effectively withdrawing
them before the trial court. Moreover, appellant did not subsequently re-urge or raise
them again. Accordingly, appellant presents nothing for our review on this issue. 
Tex. R. App. P. 33.1.
          We overrule appellant’s third point of error.
 

Conclusion
          We affirm the judgment of the trial court.



                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Taft, Jennings, and Hanks.

Do not publish. Tex. R. App. P. 47.2(b).